## Case No. 2,296.

### CALBREATH v. GRACY.

[1 Wash. C. C. 219.][1]

Circuit Court, D. Pennsylvania. April Term, 1805.

MARINE INSURANCE—FOREIGN JUDGMENT AS EVIDENCE OF BREACH OF WARRANTY — CONCEALMENT.

1. Under the clause introduced into policies of insurance, relative to the sentence of a foreign court of admiralty, the foreign sentence is not conclusive, in our courts, to falsify the warranty, which the assured is still at liberty to vindicate. The underwriters may, nevertheless, read the proceedings of the foreign court, as evidence; though not as conclusive evidence. [Overruled in Croudson v. Leonard, 4 Cranch (8 U. S.) 434.]

2. Whether it was the course of trade, to put on board a Spanish supra-cargo, with Spanish papers and colours; is a question of fact for the jury; and if this is proved to their satisfaction, the underwriters, who are bound to know the course of the trade, cannot object that such circumstances were concealed from them. [See Livingston v. Maryland Ins. Co., 7 Cranch (11 U. S.) 506; Buck v. Chesapeake Ins. Co., 1 Pet. (26 U. S.) 151; Hazard v.

---

[1] [Originally reported from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

New England Marine Ins. Co., 8 Pet. (33 U. S.) 557.]

3. It is a breach of warranty of neutrality, that a vessel and cargo, warranted American property, shall be navigated and claimed as Spanish property; and that all the evidence to prove the neutrality of the vessel and cargo, is concealed, from the captors.

[See Livingston v. Maryland Ins. Co., 7 Cranch (11 U. S.) 506.]

4. In case of such warranty, it is not only necessary that the cargo should be in truth neutral, but also that no act of commission or of omission should be performed, to jeopardize the claim to a neutral character, whether by the owner, or by his agents.

This cause came on to be retried [see Case No. 2,295], and such additional facts and arguments as are omitted before, are stated in the charge. But in the opening of the cause, on the defendant's side, the plaintiff objected to their reading the proceedings in the court of vice admiralty in New Providence; in consequence of the clause in the policy, that if the American character of the cargo should be questioned, it should be sufficient for the assured to prove it so in any court of the United States.

WASHINGTON, Circuit Justice, delivered the opinion of the court. This is a new clause, which has been introduced into policies of insurance by some underwriters, within a few years past. The sooner it receives a construction the better. To understand it, we must pursue the rule adopted as to the exposition of statutes. We must find out what was the mischief it was intended to remedy, and then the extent of the remedy. The mischief was, that the sentence of a foreign court of admiralty, condemning a vessel as enemies' property, or as lawful prize; was considered in England, and has been so decided in some of the states, as conclusive proof of that fact against the assured, so as to forfeit their warranty of neutrality, and this too, although he should be able to prove the falsity of the conclusion. The remedy was to meet and correct this, which often in former wars, and still more in those which have lately happened, was a crying evil. We have all heard of the conduct of some of the West India courts of vice admiralty, and the shameful abandonment of all correct principles, which have discharged many of their decisions. The assured did not choose that the property, when really neutral, and which they could prove to be so, should be declared otherwise in consequence of a sentence of those courts. But they never meant to go farther, and it would be improper to have done so. They are, notwithstanding the sentence, to be at liberty to vindicate the truth of their warranty. But the underwriters may combat that fact, by reading the sentence of the foreign court of admiralty as evidence, but not as conclusive evidence. Indeed it may often be essentially necessary, in order to prove the loss.

WASHINGTON, Circuit Justice (charging jury). The facts in this cause are shortly these. The Carolina, being an American bottom, commanded by an American captain, and belonging entirely to Americans; and being, in the year 1795, at the Havana; took in a cargo of goods purchased by the plaintiffs and others, American citizens, to be carried to Carthagena. But previous to her sailing, and perhaps to the purchasing of her cargo, a charter party was entered into, between Wykoff, who represented the owners of the vessel, and some of the part owners of the cargo, Robert Meade, and Cuesta and Hernandez, two Spaniards, by which it was agreed, that the cargo should be put on board by Wykoff and Meade, in which Cuesta and Hernandez should be concerned one-third, Wykoff one-third, and R. Meade one-third. That she should proceed to Carthagena, and, from thence to Philadelphia. The cargo to be consigned to Hernandez, who was to go the voyage in order to manage the affairs of the concern, but who was to receive no commission for his trouble. The cargo, taken in at Carthagena, was to be sold in Philadelphia on her arrival there, and one-third of the nett proceeds to be paid to Wykoff, one-third to Meade, and the other third to Cuesta and Hernandez. A bill of lading was signed by Bonner, the American captain, in which Calbreath and Meade, are stated to be the owners of the cargo. On the 5th April, Meade gave to Wykoff a receipt for the cost of one half of the cargo, paid him by Wykoff, deducting 2916 dollars; being Cuesta and Hernandez' one-third of the cost and expenses on said invoice. The vessel sailed some time in April, having Spanish as well as American papers and colours; with Hernandez on board, as consignee, and the apparent master of the vessel. She was met with at sea by a French privateer, made prize of, and ordered for Cape Francois. A few days afterwards, she was retaken by a British privateer, and carried into Nassau in New Providence, where she was libelled as belonging to citizens of France. Hernandez filed a claim, in which he stated, and in answer to the standing interrogatories, swore, that he was sole owner of the cargo, and Santa Maria of the vessel. He relied upon a treaty between Spain and England, whereby the regulations of the British prize laws as to recaptures, were mutually adopted by both countries. Not being able to produce such a treaty, within the sixty days, allowed him to do so; for in fact there was none such; sentence of condemnation passed on the 25th of August. On the 14th of May, the plaintiffs wrote to a broker in New York, to effect insurance on this vessel and cargo, at and from Havana; and they state her to be American property; that she had for some years past been engaged in this trade; and had been twice insured in New-York; and that she had a permission for carrying on the trade. The policy was effected accordingly.

From these facts it appears, that a vessel and cargo, ostensibly belonging to the subjects of one of the belligerent powers, navigating the sea in that character, and claimed as such before the court of admiralty; was warranted American property. It becomes the plaintiff, before he can expect to recover in this action, satisfactorily to account for this conduct, seemingly so much at variance with the engagements he had entered into with the underwriters. He justifies it by contending, that he has done nothing which was not warranted by the course of this particular trade. That the underwriters knew, or ought to have known, that no American vessel could carry on a trade from one Spanish colony to another, without assuming the character of a Spanish vessel, with a Spanish cargo. That, consequently, it was necessary to put on board a Spanish commander, for form sake at least, and to be fully documented as Spanish property. This excuse, if supported in your opinion by the fact, would carry some weight with it; provided the ground of objection, on the part of the defendant, was concealment of the circumstances, which were to change the character of the vessel and cargo. For, most certainly, it is the duty of the underwriters to know the course of the trade which they engage to insure; and it will not afterwards lie in their mouths to object, that the assured had not disclosed what they knew, or ought to have known. But, want of a full disclosure, is not the ground of the objection to the plaintiff's recovery. The assured has entered into an express warranty, that the cargo is American property. What is a warranty? It is an agreement, by the assured, in the nature of a condition precedent, which must be strictly and literally performed, before the assured can recover. It is of no consequence, whether it be material to the risk or not; and it is equally unimportant, to what cause the non-compliance with it is attributable.

These being some of the principles by which this case must be decided, the first objection, on the ground of the warranty, is, that the plaintiffs insured the whole of the cargo, as American property. Under the general clause in this policy, the plaintiff, though only one-third concerned, might, as joint owner with others, and shipper, cover the whole. Yet, it appears by the charter party, that Cuesta & Hernandez, were one-third owners of that very cargo; and, if so, the warranty is certainly violated. But the fact is denied. The plaintiff insists, that the interest of those Spaniards was not real, but colourable, with a view to the success of the voyage. That they were merely to receive one-third of the nett proceeds, upon the sale of the return cargo at Philadelphia; and, consequently, that their interest was contingent, and depended upon the completion of the voyage; and, to prove all this, he relies upon the terms of the charter party; the bill

of lading; the account stated between Meade and Wykoff, and the receipt of the former from the latter, of one-half of the cost of the outward cargo; the protest of Captain Bonner, and the deposition of M'Connell, the mate; who says, he understood the cargo to belong to Wykoff and Meade. What may be the fact, from this conflicting evidence, is proper for your decision. But, the material objection made by the underwriters, and about which there is no dispute, as to the facts, is now to be considered. The vessel and cargo are warranted American; yet, she sails with Spanish papers and colours, and apparently a Spanish master and consignee. She is met with at sea, by an enemy to Spain. Nothing but Spanish papers are made known to the captors. When taken by the British, and libelled, this Spanish supercargo, Hernandez, claims both vessel and cargo; the former as the sole property of Santa Maria, and the latter as the sole property of himself; and this claim he seals by an abominable perjury. Nothing but Spanish papers are produced. The documents, to prove the vessel and cargo American, are carefully concealed. Both are consequently condemned; as Hernandez did not, and could not support the ground of defence which he had taken. Had the truth been told, I must say, judicially, that the whole would have been restored; because it ought, by the law of nations, to have been restored. Spain and France were at war; but Spain and England were at peace with each other, and united in the war against France. America was at peace with all the world. The trade which this vessel was carrying on with the Spanish colonies, was lawful, in respect of Spain; because, in her instance, it was specially permitted. It was not a cause of condemnation in a British court, because Spain and England were in amity; and the British orders, which forbid the colonial trade of neutrals in time of war, which was interdicted in time of peace, could not apply to a trade with one of the colonies of a power, then at peace with England. The war between England and Spain did not take place till the spring of 1796. But,[2] as Spanish property originally, and taken by her enemy as prize, she became subject to confiscation to the British recaptors; so that, if Hernandez had been employed to procure the condemnation of this cargo, he could not have done it more effectually, than by the course he pursued. How then does such conduct comport with the engagement made by the assured? What did that engagement amount to? That the cargo was American property. Not only so; but, that she should not lose that character, during the voyage insured, by any act or omission of the assured, or of his agents. That she should have all the necessary docu-

---

[2] This, upon the ground of reciprocity; because, Spain does not restore the property of a friend, taken by her enemy, on salvage. The Santa Cruz, 1 C. Rob. Adm. 63.

ments to establish her neutrality, if questioned, which were required by treaties, or by the law of nations. In short, to use the emphatic words of Lord Mansfield, in an important case, she must be neutral, to the purpose of being protected. The expressions contain the pith and marrow of such a warranty; and a volume written on the subject, could not make the nature of this engagement more plain to the meanest comprehension. She must not forfeit her neutral rights, by any act or omission of the assured, or of his agent. Yet, by their act, she is provided with documents, to prove her Spanish property. When met with by the vessel of a nation at war with Spain, but at peace with America, he shows the Spanish papers, and conceals the American. When carried into New Providence, instead of claiming her as a neutral vessel, and the cargo as neutral; as if mad, or worse, he claims them as Spanish. In short, the assured have exactly "done the things they ought not to have done, and have left undone the things they ought to have done." And can it be seriously contended, that the warranty has been complied with? But, it is said, that Bonner was the real master, and the only agent of the assured. Why then did he not put in a claim for ship and cargo, on the true ground of American property? It was his duty to have done so. His omission is the same, as if, by his acts, he had produced the condemnation. He says, in his protest, that he was not permitted to do so. I totally disregard his protest, being ex parte. But who prevented him? He does not pretend to say, that the court prevented him; and, if Hernandez, or any other person attempted it, it is no excuse. But, the fact is, that Hernandez was, by the charter party, constituted supercargo and consignee of the cargo, and was appointed to manage the concerns of the owners. He then was the agent of the owners, and they are liable to all the consequences of his misconduct. This objection, then, to the plaintiff's recovery, cannot be got over.

Jury found for the defendant.